Meier Steinbrink, Spec. Bef.
(Oral decision and opinion). Both sides rest. Both sides move for judgment. Both sides waive the making of formal findings of fact and conclusions of law and will rest on the decision and opinion of the court in keeping with section 440 of the Civil Practice Act.
At the very outset, I wish to make something entirely clear. I have sat here with great patience, this record will disclose, for six days in a case that could easily have been disposed of in two or three days. And as late as yesterday, there was not only the strong intimation but there was the direct accusation that I was not impartial.
A Judge is not supposed to sit like a figurehead in the trial of any case, much less in an equity case. That has been held time and time again and the classic example of it is in the case of Finan v. New York Central & Hudson River R. R. Co. (111 App. Div. 383), which was the decision written for an unanimous court by Justice William J. Gaynor. And in that case, he said of the appellant, whose brief found fault with the Judge who interjected questions in the trial of a jury case — and this is not a jury case — “ The appellant’s fault-finding with the trial judge seems to be based on the notion that trial judges in this State are reduced to the humiliating position of having no right to say or do anything in a jury trial except to formally rule in monosyllables on questions presented by counsel; that they may do nothing to guide and control the course of the trial, or to restrain counsel and keep them within bounds and to the point, or even from taking an unfair advantage by prejudicing the jury by false suggestions, and the like.” Further, in his opinion, he said: ‘‘ while the serious and growing dispositions of some in this State seem of late to be to actually reduce a trial judge to that position in the trial of civil causes, and leave counsel to do as they please. It would not be well for the administration of justice in this State if that purpose should prevail.”
I have tried during all of my judicial experiences to let the lawyers try their cases, but also, I have tried to keep them *243 within bounds. And when I asked questions, it was for the purpose of elucidating some fact to which reference had been made.
So much for that. Now, let me deal directly with this case.
Plaintiff Wolf Stahl and defendant Ilbert Stahl are brothers. The defendant Stahl Soap Corporation is a closely held New York family corporation engaged in the manufacture of various soap products.
At present, each of the Stahl brothers owns one half of all the issued and outstanding capital stock of the corporate defendant. Their respective stock certificates bear the indorsement that the stock is transferable only in accordance with a stockholders’ agreement, dated December 14, 1949. Each certificate is signed by the plaintiff, Wolf Stahl, as president, and defendant, Ilbert Stahl, as secretary and treasurer.
Substantially, all of the corporation’s production is sold to governmental agencies by the competitive bidding process.
Continuously, since the corporation was formed in 1946, with the possible exception of a few days and until January 12, 1959, plaintiff was the corporate president and chairman of its board of directors. Ilbert Stahl was secretary and treasurer. There were no other officers.
During all of this period, the brothers shared ownership and control of this business and co-operated in its management.
At the outbreak of World War II, the brothers came to the United States from Austria where their family had long engaged in the manufacture of soap. The assets of the two brothers and their mother were used to set up the soap business, first in Buffalo and then in New York City.
The immediate predecessor of the corporation was a partnership known as Stahl Brothers Soap and Chemical Manufacturing Co., which likewise was equally owned and controlled by the brothers.
After the corporation was formed and until February 14,1949, their sister owned one third of the capital stock and served as the third director and as vice-president. Then she sold her stock interest in equal parts to each of the brothers and resigned as an officer and director.
The nuances of all of the testimony must be carefully appraised in order to arrive at a righteous conclusion.
At the December 5, 1954 meeting, they were still in limited harmony, though in 1952 they had undoubtedly tentatively agreed on the desirability of the sale or dissolution of the company, and at this 1954 meeting they reduced their additional salaries to $7,000 a year each.
*244 The office of vice-president remained vacant until January 12, 1959.
Within a very short time after this, their sister retired, and in order to maintain the essential integrity of what had been the partnership and to avoid future difficulties and disagreements betAveen them, the brothers—with the corporation — entered into the stockholders’ agreement previously referred to.
This agreement assured to each brother a position of parity in respect to his corporate status, compensation and equity.
There can be no doubt that it was intended to insure their continuation in the offices then held by them.
With the consent of both brothers, the agreement was prepared by the defendant Louis N. Field, an attorney, and was executed in his office.
Some time later, Ilbert Stahl recommended that Louis N. Field should be named as a third director of the corporation. At this time, Wolf Stahl was not intimately acquainted with Louis N. Field, but he agreed to Field’s election, provided his 50% control of the company should not be diminished or prejudiced.
Accordingly, both brothers required defendant Field to execute and submit in advance of his election an undated letter of resignation. The plaintiff has testified that this was to become effective immediately upon the demand of either of the brothers, and also, that the letter was accepted by both brothers by the indorsement of their signatures thereon.
Defendant Ilbert Stahl testified that this letter of resignation was only to become effective at the request of himself and his brother.
To me, such a claim is utterly ridiculous and without foundation, for article 2, section 10 of the by-laws made it entirely clear that any officer or director could be removed from his office by a vote of the majority of the board. Wolf Stahl and Ilbert Stahl constituted a majority, therefore, they did not need Louis N. Field’s resignation.
By the questions of defense counsel, it was suggested that this elusive resignation was in the minute book prior to the time when it was first sent to Wolf Stahl’s towyer and that when the book Avas returned, the resignation was missing; that thereupon, the defendant Louis N. Field numbered the pages. However, Mr. Kaminsky, a most reputable member of the New York Bar and who at that time was Wolf Stahl’s laAvyer, has made it entirely clear that these pages were numbered when the minute book first came to him and that he had the important pages photo-stated.
*245 Surely, if the resignation was in the book, that was one of the very items that was so important that it would have been photostated.
Also, there was some intimation that this resignation was in the drawer of one of the desks in the office. But Ilbert Stahl was the one who was in charge of the office and infrequently went above the ground floor, while Wolf Stahl was completely in charge of production.
Thereafter, the corporation, under this mutually protective arrangement, operated for a period of nine years. The business flourished, with Wolf Stahl continuing as president and in complete charge of production, while his brother, Ilbert Stahl, the defendant, took care of the office on the ground floor.
Field, on the other hand took no active part in the business, acting only as a nominal third director.
In December of 1951, the business was so successful that the corporation, under the aegis of its board, adopted a schedule of additional compensation under which each brother in the future would be entitled to additional salary or compensation computed at the end of the corporate fiscal year in accordance with the amount of gross sales for that year. The amount thus computed was to augment the salary of $350 per week drawn by each brother.
In the year 1958, under plaintiff’s presidency, the corporation had the most successful business year in its history. Its gross sales were in excess of one million dollars. In accordance with the schedule previously adopted, plaintiff and defendant were entitled automatically to the payment of additional salary in the sum of $20,000. The year 1958 also saw the highest net profit in the corporation’s history. This was achieved with the corporation’s present machinery and under the leadership of plaintiff.
It was not until August of 1958 that the close co-operation which theretofore had existed began to show cracks in the' corporate structure. Now came the lure of personal benefit on the part of Ilbert Stahl. Since then, through the machinations of Ilbert Stahl, acquiesced in, if not stimulated by the vote of Louis N. Field, Wolf Stahl saw himself ousted by his brother and Louis N". Field, the latter of whom owned no stock whatever in the corporation nor did he have any background in the soap business.
The individual defendants, undoubtedly acting under legal guidance, believed themselves wearing an amulet which would protect them from legal attack.
*246 Wolf Stahl, on a number of occasions, sought to invoke Field’s prior resignation, but his requests were ignored. When he demanded production of the written resignation, he was informed that it was not among the corporate papers and had been lost or was in his own possession.
I discredit this testimony. And one of the basic reasons for my discrediting it is to be found in the minutes of the meeting of August 29, 1958, where Mr. Field, present at that meeting, and on page 2 of the minutes made this statement: ‘1 The secretary, Mr. Ilbert Stahl, presented a copy of a letter sent by certified mail to all of the directors and was directed to place it in the minutes of the corporation. The meeting was opened with an informal discussion in which everyone, including Mr. Braunschweig,”—who was a lawyer there for Wolf Stahl—“ joined. The meeting was then opened formally by Mr. Field. ’ ’
Mr. Louis Field’s activity or his failure to act is best evidenced by the minutes on page 3, where he stated: “ As I recall it, I was elected a director many years ago and at that time at my own suggestion and request, I executed a written letter of resignation and the minutes stated that that letter of resignation was to become effective when and only when both of the other directors requested it.”
That was the time when Louis N. Field, a lawyer, should have immediately turned to the minutes to find where any such statement was embodied in the minutes.
I have searched these minutes but to no avail. They disclose nothing of the kind.
What possible motive could Wolf Stahl have for possessing himself of this resignation in the light of his testimony that he and Ilbert Stahl, together, signed the resignation before the August, 1958 meeting?
On the other hand, Ilbert Stahl, or his co-operative friend, Louis N. Field, had every reason to make that resignation unavailable so as to destroy the claim that it was to be effective on the demand of either one of the Stahl brothers.
I am firmly convinced that surreptitiously this resignation was removed from the minute book where it properly belonged. Whether it was removed by Ilbert Stahl or by Louis N. Field, I do not know. But Ilbert Stahl, under the statute, was charged, as secretary, with keeping the books and records of the corporation and he may not now shield himself behind his responsibility by the comment that he took no active part with reference to the resignation.
At a directors’ meeting held August 29, 1958, Ilbert Stahl, with the aid of the defendant Field and over plaintiff’s opposi *247 tion, approved Ilbert Stahl’s own prolonged trip to Europe for the ostensible purpose of inspecting new machinery for the corporation.
Plaintiff then immediately demanded the calling and holding of an annual meeting, no such meeting having been called or held for several years, for the purpose of electing new directors and to effect the performance by defendant Field and make operative the resignation which Field previously had signed.
These requests were ignored, until finally, Wolf Stahl obtained an order from the Supreme Court, Queens County, directing the calling of such annual stockholders’ meeting on January 12, 1959.
At that time, not only did the defendant Field refuse to make effective the resignation, as demanded, but Ilbert Stahl renominated him as a director. A deadlock resulted and no new directors were or could be elected.
In the light of all that had happened, I am surprised that Field did not join Ilbert Stahl in voting for himself. Perhaps he was somewhat modest in this regard or perhaps it was conscience that prompted him to refrain.
Immediately thereafter and on the same day, a directors’ meeting was held. Wolf Stahl again protested the presence of defendant Field as a director. The minutes of that meeting, which is part of plaintiff’s Exhibit 4, make clear that defendants Field and Ilbert Stahl first proceeded to oust the plaintiff as chairman of the meeting and of the board of directors, as provided in the by-laws, and to put defendant Field in as chairman.
By rapid votes, so far as the minutes disclose, and without discussion, they proceeded to take acts which precipitated this lawsuit.
They were as follows:
(A) They removed plaintiff as president and chairman of the board of directors.
(B) They elected defendant Ilbert Stahl as president and treasurer.
(0) They elected Field as secretary and chairman of the board.
(D) They revived the long dormant office of vice-president, which had not theretofore been held by anyone since 1949 and which under the by-laws is without specified duties and responsibility; and they threw a bone to the plaintiff by electing him to the office of vice-president.
(E) Together, Ilbert Stahl and Louis N. Field revoked plaintiff’s authority to sign checks on behalf of the corporation, which *248 authority had theretofore been held both by plaintiff and defendant Ilbert Stahl.
(F) They indefinitely and without authority postponed the payment of the additional salary under the schedule previously mentioned and to which plaintiff had become entitled in the amount of $20,000.
(G) They reduced plaintiff’s salary from $350 a week to $100 a week.
(H) They also reduced Ilbert Stahl’s salary as president and treasurer to $100 a week, but immediately created the entirely new office of managing director, which is not provided for in the by-laws of the corporation, and they voted him an additional salary, as such, of $250 a week.
Here was a hocus-pocus to which no court of equity can give sanction, for by its acts and procedures, not only was the parity, possession and control of the Stahl brothers which had been assured by and provided for in the stockholders’ agreement, but such parity was completely destroyed.
If that was not enough, further humiliation was heaped upon Wolf Stahl in order to cut him down to the level of an office boy. Ilbert Stahl and Field caused to be posted in the corporate factory and office for all employees to see a notice that all requests for information of any nature or any source were to be referred to defendant Ilbert Stahl for attention.
Also, they caused to be sent to the corporation’s accountants a notice to the effect that all inquiries of any kind concerning the corporation or its financial setup were to be referred for attention and answer to defendant Ilbert Stahl.
The corporation’s employees were notified not to disclose to plaintiff any information as to outgoing bills or accounts or to discuss with or to disclose to him production data or inventories, or to give him aid or clerical assistance.
On March 6, 1959, at a so-called meeting of the directors, they adopted a resolution giving to defendant Field and the corporation’s accountant the authority to sign corporate checks in the absence of the defendant Hbert Stahl.
The whole atmosphere is one that smells to high heaven and no member of the Bar should have loaned himself to this Idnd of chicanery.
At a meeting attended by the so-called three directors, Ilbert Stahl and Louis N. Field, over the protest of Wolf Stahl, authorized Hbert Stahl to make an extended trip abroad with a view to purchasing foreign-made soap manufacturing machinery. To me, this appears to have been wholly unnecessary, though I do *249 not set myself up as an expert in soap production for the very reason that the machinery which the corporation was using was, according to the testimony of Wolf Stahl, which I accept, adequate for its purposes. And this was further evidenced by the fact of the very large increase in the business during 1958 while Wolf Stahl was functioning and in charge of production.
The answer in this case admits the acts which were taken against plaintiff at the meeting of January 12,1959; and likewise, that on February 27, 1959 Ilbert Stahl posted the notice in the factory of the corporation addressed to the employees, and a similar admission with reference to the letter sent to the corporation’s accountant, the existence of the agreement and the by-laws which were kept in a very sloppy fashion.
Especially significant is it that the agreement in paragraphs 8 and 9 contains the following provision:
“ 8. During such time as both stockholders own an equal amount of the capital stock of the corporation they shall not be removable either as an oEcer or director of the corporation, and their compensation shall be equal regardless of their duties.
“ 9. Both stockholders agree that they will devote their entire time and energies to and in behalf of the corporation, but neither one shall interfere with the performance of the other’s duties.”
These provisions were not violative of positive law or the rights of creditors. See Clark v. Dodge (269 N. Y. 410), where the court, quoting from an earlier case of Ripin v. U. S. Woven Label Co. (205 N. Y. 442, 447) said: “ Such corporations were little more (though not quite the same as) than chartered partnerships.”
No question concerning creditors is here involved. Where equity has jurisdiction of the parties and the subject matter, its strong arm will reach out to do equity as between the litigants.
In Isaac v. Marcus (258 N. Y. 257,264) the court said: “ Courts of equity will, at the suit of a stockholder, interpose their powers to remedy or prevent a wrong to a corporation by its oEcers or directors when the corporation, because it is controlled by the wrongdoers or for other reason, fails and refuses to take appropriate action for its own protection.”
Quite recently, there was a case in this Department which applies with all of its force to the conclusion which I have reached here. The case to which I refer was that of the Rector, Churchwardens and Vestrymen of Holy Trinity Church v. Manufacturers Trust Co. (18 Misc 2d 761). In that case, the so-called Melish faction, -without the meeting having been called *250 in the manner in which the Religious Corporations Law provides, proceeded to take action, which if valid, would have given them control of over $400,000 of the church’s assets. Justice Mab-TuscELiiO found that the meeting was not regularly held and that as of the date of the meeting, all subsequent actions were null and void. And this was emphasized in this case where they sought summary judgment in favor of the plaintiff. This case was unanimously affirmed (9 A D 2d 932; motion for leave to appeal denied 7 N Y 2d 712).
The conclusion in this case will be that the defendant Ilbert Stahl will be required to account for his conduct in the management and disposition of the funds and property of the defendant corporation and be compelled to pay back to the corporation moneys improperly paid out by way of salaries or attorneys’ fees where he, personally, and not the corporation was involved, or if it should transpire that any moneys were lost or wasted by him in violation and breach of his fiduciary relationship under the stockholders’ agreement of December 14, 1949, then Ilbert Stahl will be directed to account for his acts in connection therewith.
The defendant corporation is directed to make a full accounting of its gross sales and net earnings from December 1, 1957 through to the end of the year 1958, and on that basis, the amount due plaintiff pursuant to the schedule of payments of additional salaries adopted on December 1, 1951 be set apart for payment to plaintiff.
Defendants Ilbert Stahl and the corporation be and they are hereby directed to pay plaintiff such sum or sums as may be found due him under and pursuant to the terms of the said schedule of payment of additional salaries.
Further, that defendants Ilbert Stahl and the corporation be directed to pay to plaintiff such sum as may be found due him by reason of his right to be paid a salary or other amount under the guise of payments as managing director equal to that received by defendant Ilbert Stahl for the period from January 12,1959 to date.
From the time of Wolf Stahl’s request that the resignation of Louis N. Field be made effective, it is held that subsequent corporate action in which Louis N. Field participated be and it is hereby declared null and void and that he was not then and is not now lawfully a director of the corporation. Further, that defendants are directed to pay the plaintiff whatever sums may be necessary to equalize that received by defendant Ilbert Stahl, and when I say ‘ ‘ defendants, ’ ’ I exclude Louis N. Field, because from the moment his resignation was requested by Wolf Stahl, *251 all subsequent acts are absolutely null and void and are so declared at this time. And that the designation or election of a managing director is null and void.
Ilbert Stahl is directed to perform specifically the terms of the stockholders’ agreement dated December 14, 1949 and the plaintiff Wolf Stahl re-established to the status quo which existed at the time defendant Louis N. Field first began to act in concert with Ilbert Stahl and when his resignation was demanded or requested, part of which appears in the minutes of a meeting. And the plaintiff Wolf Stahl will be restored to his authority to draw and sign checks of the corporation without countersignature in the same way and under the same conditions that existed from the time that Louis N. Field ceased being a director as hereinbefore provided.
The motion previously made by Wolf Stahl for a preliminary injunction and for an order directing specific performance of the stockholders’ agreement and to elect and restore him to his office as president, together with his seeking an injunction against defendants from entering into any contract for the purchase of certain machinery—which motion was denied in toto by Justice Hast but modified on appeal (Stahl v. Stahl, 8 A D 2d 960) to the extent that defendants were restrained from purchasing machinery already alluded to — these injunctions are now made permanent until such time as both Wolf Stahl and Ilbert Stahl agree that the necessity for such new machinery exists.
The judgment will further provide that Wolf Stahl, in common with Ilbert Stahl, shall have access to all the books and records to which he had access prior to January 12, 1959, as president and chairman of the board of directors of the defendant corporation.
The defendants will be required to post a notice for the information of the employees revoking the earlier notice which directed them to communicate only with Ilbert Stahl, and, likewise, there will be a revocation of the notice given to the corporation’s accountants.
Defendant Louis N. Field is now removed as a director of defendant corporation, and, in his place, Wolf Stahl and Ilbert Stahl may agree on the election of a director. If they cannot agree and only in the event that they wish it, this court will co-operate with them in the endeavor to save this business which these two brothers, seeking to cut each other’s throats, are destined to ruin.
Wolf Stahl will be restored to his office as president and chairman of the board of directors with such powers and duties as he had prior to January 12, 1959.
*252 One further word. I want it distinctly understood that an oral injunction issued from the Bench is as binding and enforeible as is a written injunction. The holding to that effect is to be found in a case which was tried before me and where I issued an oral injunction against the defendant from the transfer of property in fraud of creditors, and that was done on a Friday; but early Saturday morning, a petition in bankruptcy was filed by the defendant. Thereafter, motion was made before me to punish the one thus acting for contempt. I held him in contempt, I fined him and I sentenced him to a prison sentence. This was upheld by the Appellate Division in Miller v. Smerkins (243 App. Div. 780); and subsequently [this principle] was further affirmed by the Court of Appeals.
Finally, if there be any dispute as to the facts in this case, the findings will be in favor of the plaintiff and with the witnesses who have testified on his behalf.
And this judgment, in view of what I regard as the unmoral conduct on the part of Ilbert Stahl, will be with one bill of costs, but as against Ilbert Stahl only.