Fuchsberg, J.
(dissenting). My vote too is for reversal. However, the decisional path that I would take differs appreciably not only from that of the majority but from that of my fellow dissenters as well.
Specifically, unlike the other dissenters, I am of the opinion that the parties entered into an enforceable agreement. But, for the reasons well stated both in Judge Gabrielli’s alternative rationale and in Mr. Justice Lupiano’s dissenting memorandum at the Appellate Division (61 AD2d 911), I conclude that we are required to find that the agreement was not ambiguous and that, as a matter of law, it terminated in accordance with its terms during the father’s lifetime. (See Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d 397; Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 291.)
I also take issue with the majority’s reasoning that the option was enforceable only because it was separable from an otherwise illegal contract. In my view, the entire agreement is lawful qua agreement, and since it is one entered into between the controlling stockholders of a small, nonpublic corporation, it is not to be scrutinized by a rigid, hypertechnical reading of section 27 of the General Corporation Law, now part of section 701 of the Business Corporation Law.
Small, closely held corporations whose operation is dominated, as its stockholders and creditors usually are aware, by a particular individual or small group of individuals, must be distinguished, legally and pragmatically, from large corporations whose stock is traded on a public securities exchange and where the normal stockholders’ relationship to those managing the corporation is bound to be impersonal and remote. Obviously, the latter’s operations are rarely, if ever, *318 covered by stockholders’ agreements, and the Business Corporation Law itself is the sole restriction on their management.
In the close corporation, investors who themselves are not part of the dominant group commonly rely on the identities of the individuals who run. the business and on the likelihood of their continuance in power. As a practical matter, these individuals will be expected to exercise a broad discretion and considerable informality in carrying out their management functions; this flexibility may be regarded as one of the strengths of a smaller organization. Indeed, faith in the integrity and ability of the managers is what usually motivates the investment. Looked at realistically, such corporations, often organized solely to obtain the advantage of limited personal liability for their principals, to qualify for a particular tax classification, or for some similar reason, are frequently "little more * * * than charter partnerships” (Ripin v United States Woven Label Co., 205 NY 442, 447). Control of such matters as choice of officers and directors, amounts of executive salaries, and options to buy or sell each other’s stock — exactly the sort of things with which the agreement before us dealt — is usually mapped out by agreements among stockholders. (See, generally, Israels, The Close Corporation and the Law, 33 Corn LQ 488.)
In short, so long as an agreement between stockholders relating to the management of the corporation bears no evidence of an intent to defraud other stockholders or creditors, deviations from precise formalities should not automatically call for a slavish enforcement of the statute. For this is the "governing criterion]” by which to test "the validity of a stockholders’ agreement” (Delaney, The Corporate Director: Can His Hands Be Tied in Advance, 50 Colum L Rev 52, 61; see, also, 1 O’Neal, Close Corporations, § 5.08). This would not leave without remedy those minority stockholders in close corporations whose interests may be abused. Available to them and at least equally effective are the equitable remedies by which officers and directors can be made to respond for violations of their trust obligations (Meinhard v Salmon, 249 NY 458).
Analysis of the agreement and its surrounding circumstances here illustrates the wisdom of this approach. The corporation had for a long time been a one-man business in every sense, the man being Triggs, the father. Until he gave a minority interest to each of his sons, he was the owner of all *319 the voting stock; afterwards, it was all owned by the father and his sons, who were preparing to succeed him. At the time of the agreement, the father, together with the son who was the other party to the disputed writing, held the majority of this stock. Given their service in the business, their stockholding, and their relationship to each other and to the history of the corporation, it was to be expected — and not at all extraordinary — that an arrangement for their continuance in office and their compensation would be executed. There is not the slightest indication that, had the parties gone through the routine of presenting the contract to duly called stockholders’ and directors’ meetings, it would not have been rubber-stamped as a matter of course. It is significant that no other stockholder challenged the agreement during the father’s lifetime and that the dispute since then has gravitated only around the son’s insistence that the option to purchase his father’s shares had not expired, a term which in any event, though it found its way into the stockholders’ agreement, related to an essentially personal matter distinct from any corporate management obligations as such.
In sum, given that no other shareholder or member of the general public has been harmed, there is no good reason to measure the agreement by the less sophisticated standards of yesteryear. Tellingly, the often conflicting and unpatterned holdings that characterized our varied decisions on this point in the past (see 3 White, New York Corporations [13th ed], par 620.03; compare Clark v Dodge, 269 NY 410, with Manson v Curtis, 223 NY 313; McQuade v Stoneham, 263 NY 323; and Long Park, Inc. v Trenton-New Brunswick Theatres Co., 297 NY 174) have been overshadowed by the enactment of subdivision (b) of section 620 of the Business Corporation Law. At that time, the Legislature expressly indicated that it intended to overrule, at least in part, many of those decisions that struck down shareholders’ agreements (Legislative Studies and Reports, McKinney’s Cons Laws of NY, Book 6, Business Corporation Law, § 620, p 418). In doing so, it made clear its purpose to approve and expand the ruling in Clark v Dodge (269 NY 410, supra), which upheld a controverted stockholders’ agreement in a close corporation context.
Chief Judge Breitel and Judges Jasen and Wachtler concur with Judge Jones; Judge Gabrielli dissents and votes to reverse in an opinion in which Judge Cooke concurs; Judge *320 Fuchsbeeg dissents and votes to reverse in a separate dissenting opinion.
Order affirmed.